**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| KR ENTERPRISES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Cause No. 3:16CV708-PPS |
| | ) |
| ZERTECK, INC., d/b/a Boat-N-RV Warehouse, | ) |
| TILDEN RECREATIONAL VEHICLES, INC., | ) |
| d/b/a Boat-N-RV Superstore, | ) |
| RIDGELAND RECREATIONAL VEHICLES, INC., | ) |
| d/b/a Boat-N-RV Megastore, | ) |
| CROSSVILLE BNRV SALES, LLC, | ) |
| d/b/a Boat-N-RV Supercenter, | ) |
| FLORIDA BNRV SALES, LLC, | ) |
| d/b/a Factory Direct Marine & RV, and | ) |
| RIDGELAND RECREATIONAL VEHICLES, INC., | ) |
| d/b/a Boat-N-RV World (North Carolina), | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

A consortium of RV dealerships received 21 new RVs valued at over $800,000 from a manufacturer, Evergreen Recreational Vehicles LLC, but never paid for them. This case is about how much, and to whom, the dealerships owe on those 21 RVs. The defendant dealerships are related to one another, and so the parties and I collectively refer to them as "BNRV" — which is short for Boat-N-RV. Evergreen, the manufacturer, has never been a party to the case and is now out of business and has been liquidated. Instead, the complaint was filed initially by 1st Source Bank as the plaintiff. 1st Source claimed that it stood in the shoes of Evergreen to collect on the debt because the bank had a first priority blanket security interest in all of Evergreen's assets,

including its accounts receivable, derived from Evergreen's execution of a Loan and Security Agreement with 1st Source in 2009.

This case was originally set for a bench trial in August 2018.  But in the run up to the trial, 1st Source disclosed that a few months earlier, it sold its claims against BNRV to an entity known as KR Enterprises, Inc.  Because BNRV wanted time to sort out the significance, if any, of this assignment of the claim, the trial was postponed, and discovery was reopened so BNRV could ascertain the circumstances leading to the assignment to KR.

Eventually a second amended complaint was filed, in which KR was substituted for 1st Source as the party-plaintiff.  [DE 111.]  KR's complaint claims that on or about May 1, 2018, it "purchased a certain amended and restated promissory note executed by Evergreen in favor of 1st Source Bank," and that as part of that transaction, 1st Source assigned to KR all of its interest in 1st Source's Loan and Security Agreement with Evergreen, as well as 1st Source Bank's interest in this lawsuit and its claims against BNRV.  [DE 111 at ¶11-14.]  The second amended complaint makes three legal claims, all in pursuit of a judgment of $808,663.00 plus treble damages, attorney's fees and pre- and post-judgment interest.  The causes of action KR Enterprises asserts are all based on state law:  Account Stated (Count I), Breach of Contract (Count II) and Conversion (Count III).  Subject matter jurisdiction is based on diversity of citizenship which has been verified.

The matter was tried to the court without a jury.  Pursuant to Fed.R.Civ.P. 52(a), this opinion includes my findings of fact and conclusions of law resolving the case to judgment.

### Findings of Fact

On June 19, 2009, Evergreen Recreational Vehicles and 1st Source Bank entered into a Loan and Security Agreement pursuant to which 1st Source Bank agreed to lend money to Evergreen from time to time.  To secure its obligations to the bank under the Agreement, Evergreen granted 1st Source a first priority blanket security interest in all of its assets including all present and future accounts, accounts receivable, contract rights, contracts, and claims.  The schedule of collateral, always including this language, was amended and restated at least once each year until Evergreen's closure in 2016.  1st Source perfected its interest in this collateral by filing a Financing Statement with the Indiana Secretary of State on July 2, 2009, as continued on January 7, 2014, and as continued again on January 18, 2019.

Kelly Rose was founder, chairman and majority owner of KR Enterprises which, in turn, was the principal owner of Evergreen. Evergreen manufactured recreational vehicles out of its headquarters in Elkhart, Indiana. Rose had decision-making control over both KR and Evergreen, and Rose was a guarantor of Evergreen's indebtedness to 1st Source.  When times were lean at Evergreen, as they often were in 2015 and 2016, Rose would make periodic capital infusions to keep the business afloat.  Don Emahiser

was Evergreen's President, and Joseph E. Katona, III was Evergreen's Chief Financial Officer.

The BNRV defendants are six boat and recreational vehicle retailers located in New York, Pennsylvania, Tennessee, North Carolina, South Carolina, and Florida. Evergreen and BNRV had an established course of dealing in which Evergreen would sell and deliver RVs to BNRV, and BNRV would pay Evergreen for the RVs upon receipt of an invoice. Sales coordinators of Evergreen would deal directly with Derwood "Don" Littlefield, the principal of all the BNRV defendants, for approval of RV purchases, irrespective of the dealership to which the RV would ultimately be sent.

During April and May of 2016, BNRV ordered 21 RVs from Evergreen, the total invoice price for which was $808,663.00. In accordance with their course of dealing, Evergreen shipped the 21 RVs, each with its corresponding Certificate of Origin, to the designated BNRV dealerships. Three RVs went to defendant Zerteck's "Warehouse" dealership in New York; five went to the Florida defendant's "Factory Direct" dealership in Panama City Beach; two went to defendant Ridgeland's North Carolina "Boat-N-RV World" and three to its South Carolina "Megastore" dealership; three went to defendant Tilden's Pennyslvania "Superstore;" and finally, five went to defendant Crossville's "Supercenter" location in Tennessee. The Certificates of Ownership certified that each RV was the property of Evergreen and identified the individual dealership defendant as the transferee. None of the invoices for the 21 RVs — totaling $808,663.00 — has ever been paid.

Evergreen would "accrue" 3% of its monthly total of all sales for future warranty repair reimbursement.  CFO Katona explained that this didn't mean putting 3% of the actual total invoice amount aside, but just making "a journal entry to set up a potential liability."  [DE 162 at 87, $\ell\ell$. 12-13.]  Actual warranty costs paid by Evergreen would be reflected against that accrual for bookkeeping purposes.  In 2015, Evergreen began incurring unusually high warranty obligations, exceeding the 3% accrual.  While this wasn't the sole reason that Evergreen went out of business, it was a contributing factor.

In the course of dealing between Evergreen and BNRV, a dealer would submit a warranty claim to Evergreen's parts, service and warranty department for approval, and after the claim was resolved, Evergreen would reimburse the dealer by check.  In this way, warranty claims were handled and accounted for separately from floor plan purchase amounts.  Prior to going out of business in June 2016, Evergreen had last paid BNRV for warranty parts and labor by a check dated January 26, 2016.

At the time the 21 RVs were delivered in 2016, Evergreen was offering a rebate program on terms spelled out in a March 14, 2016 letter to Don Littlefield from Michael Scheetz, Evergreen's Vice President of Sales and Marketing:

> Per our conversation we would like to offer you the following program on Lifestyle, Bay Hill, Bayview and Tesla Fifth Wheels and Layton and Sun Valley Travel Trailers . . .
> Quarterly, Evergreen RV will rebate 3% of purchases on products that were shipped and funded in that quarter less any discounts or incentives not including freight[.]
> Quarterly, Evergreen RV will pay you personally $650...per unit on all units shipped and funded in that quarter[.]

This program is effective on all units shipped and funded on or after 3/1/2016 and will continue on all units shipped and funded through 2/28/2017.

[Def. Exh. 42, p. 3.]

Under the immediately preceding rebate program, Littlefield was to be paid $250 per unit, and the dealerships' rebate was 1% of invoice. Evergreen had paid BNRV all rebates due through 2015. On April 13, 2016, Michael Scheetz sent an email to Don Littlefield with a spreadsheet showing rebates due for first quarter 2016 sales, and indicating that payment of the rebates would be forthcoming. Evergreen failed to make those rebate payments. As of January 31, 2018, Littlefield assigned his claims for unpaid rebates to defendant Crossville, the Tennessee dealership.

Evergreen set up separate accounts with each of the defendant dealerships, based on their separate dealership applications. BNRV's floor plan financing with M&T Bank is a co-borrowing arrangement with a single master note and master loan agreement with total availability of over $36 million, under which each individual dealership has a sub-limit of borrowing. Although BNRV would send requests for funding from a particular dealership for a particular RV, M&T's approval decision would be based not only on the individual dealer's sub-limit but the bank's overall exposure with BNRV as a whole. On that basis, credit would sometimes be approved for more than a particular dealership's sub-limit.

At some point in time, Kelly Rose decided that he no longer wanted to make capital infusions to keep Evergreen afloat, and so in June 2016, Evergreen went out of

business.  As a result, by memo dated June 8, 2016, BNRV instructed M&T Bank, its
floorplan lender, not to make any further payments to Evergreen, including for the 21
RVs BNRV recently received and that are now the subject of this lawsuit.  At the same
time, BNRV sent Evergreen a letter terminating its dealership agreement with
Evergreen and demanding that Evergreen repurchase all new Evergreen product in
BNRV's possession.  With respect to the 21 RVs at issue here, BNRV expected Evergreen
to take back 20 of the RVs; one had already been sold by BNRV.  BNRV's letter also
demanded Evergreen's payment to the BNRV's dealers for unpaid sales rebates and
warranty claims that were pending.

On June 23, 2016, Evergreen sent a letter to M&T Bank demanding payment for
the 21 RVs.  M&T Bank forwarded the letter to BNRV.  On June 30, BNRV's General
Counsel Thomas Shields requested copies of the invoices for the 21 RVs from
Evergreen.  These were furnished on July 1.

After Evergreen was out of business, BNRV provided after-market warranties to
purchasers of Evergreen RVs.  Those warranties provided less coverage than a
manufacturer's warranty, and had an impact on the retail price of the RV.

On July 25, 2016, 1st Source Bank sent a demand letter to BNRV and M&T Bank
asserting a valid first-priority perfected security interest in all of Evergreen's assets,
including accounts receivable, and instructing that the $808,663.00 owed by BNRV to
Evergreen was to be made payable and delivered to 1st Source.  BNRV made no
response to the invoices it received from Evergreen or the demand letters it received

from Evergreen and 1st Source Bank, and has not paid the invoice price.  This lawsuit followed a few weeks later.

Of the 21 RVs, BNRV sold 20 to customers between June 6, 2016 and April 7, 2018, for total proceeds of $1,062,451.57.  Yet BNRV has never paid its supplier — Evergreen — for those 20 RVs. The one RV that BNRV has not yet sold had an invoice price of $51,918.00.

In winding up its business, Evergreen hired Hahn Auctioneers to assist in the liquidation of its inventory.  Hahn held an auction of Evergreen parts and equipment, and the proceeds totaling over $1.2 million were remitted to 1st Source Bank and applied to Evergreen's outstanding loan balance.  Evergreen also made efforts to collect accounts receivable with the assistance of loan workout officers of 1st Source Bank. These collections were also applied to Evergreen's loan balance with 1st Source Bank. BNRV was one of only two accounts with Evergreen which did not pay anything in response to these collection efforts.

As noted above, on May 1, 2018, 1st Source Bank sold and assigned the Evergreen Note and its security interests to KR, which is owned by Kelly Rose and his wife.  1st Source Bank and Kelly Rose had discussed assigning the note and security interests as early as Fall 2017, at a time when Evergreen's debt to 1st Source Bank was just over a million dollars.  By February 2018, it was agreed that Kelly Rose would pay a sum of money in exchange for assignment of the Evergreen Note and security interests.

Collectively, KR and STCR Real Estate LLC, a real estate company owned by Kelly Rose, paid 1st Source Bank $1,010,947.80 on March 6, 2018 to purchase the Evergreen Note and the rights 1st Source Bank had pursuant to the Evergreen Note. (For ease of reference I will only refer to KR and will ignore STCR in this opinion). The sale and assignment was memorialized on May 1, 2018, after a final reconciliation had been completed by April 30. The final reconciliation involved settling expenses such as legal fees and income including 1st Source's sale of two remaining Evergreen trailers.

Recall that Rose has personally guaranteed the indebtedness of Evergreen to 1St Source Bank. Rose was interested in buying the Evergreen Note to be able to pursue the BNRV debt and to stop incurring interest on Evergreen's indebtedness to 1st Source and other associated expenses. Rose testified that he was simply tired of dealing with 1st Source Bank and he wanted to cut ties with them. This also gave him the ability to control the collection efforts against BNRV done through this lawsuit.

<u>**Conclusions of Law**</u>

I.     **KR's Acquisition of Security Interest**

Before getting into the merits of the case, there is a preliminary issue dealing with whether KR is the proper party to be prosecuting this lawsuit. I'm not persuaded by BNRV's contention that 1st Source's security interest in Evergreen's account receivables was extinguished prior to the assignment by 1st Source to KR. BNRV takes the punctilious position that because KR made payments in March that caused 1st Source to reflect Evergreen's loan balance as zero, the debt was extinguished and the

account receivable no longer existed and could not be transferred by the General

Assignment executed by 1st Source and KR on May 1, 2018.  Therefore, on BNRV's

reading of the situation, the General Assignment was a nullity.

 In short, under BNRV's conception of matters, KR paid off Evergreen's debt for

no business purpose other than to spare Kelly Rose from his guaranty, and in doing so

mistakenly let BNRV off the hook for any account receivable with Evergreen. In other

words, BNRV is off scot free; they get to keep the RVs they never paid for, and they

have no obligation to remit any of the over $1 million they collected in proceeds from

the sale of those RVs. If it all seems a little too facile, it's because it is.

 BNRV seeks to exclude what it characterizes as extrinsic evidence explaining the

intentions of the parties to the assignment, namely for KR to purchase Evergreen's loan

so as to stop the accrual of interest in the bank's favor and to allow Kelly Rose get

control of this lawsuit and the efforts to recover from BNRV.  BNRV argues that the

unambiguous language of the written instrument  — that it assigns the 2009 Loan and

Security Agreement and Evergreen's remaining promissory note *as of May 1, 2018* —  is

not susceptible to contradiction by such evidence.  It is true that on May 1 the books and

ledgers of 1st Source reflected the Evergreen loan as fully paid. But the only reason it

was "paid in full" was because Kelly Rose, on behalf of KR, cut a huge check to 1St

Source to purchase the account.  Yet, BNRV wants us to conclude that KR got nothing in

return. In other words, KR was assigned a worthless account because the account had a

zero balance as of May 1, 2018.

If that were so, then the Assignment expressly assigns a worthless loan agreement and promissory note, and is rendered meaningless.  But the paramount goal of contract interpretation is to ascertain and effectuate the intent of the parties.  *Vic's Antiques and Uniques, Inc. v. J. Elra Holdingz, LLC*, __ N.E.3d ___, 2020 WL 769638, at *2 (Ind.Ct.App. Feb. 18, 2020). This in turn requires that words and phrases are to be given their plain meaning unless doing so would defeat the parties' intent, and agreements are to be construed so as to give each provision meaning and to avoid rendering any provision, or the agreement as whole, meaningless.  "We review the contract as a whole, attempting to ascertain the parties' intent and making every attempt to construe the language of the contract 'so as not to render any words, phrases, or terms ineffective or meaningless.'"  *Alexander v. Linkmeyer Development II, LLC*, 119 N.E.3d 603, 612 (Ind.Ct.App. 2019).

The May 1 General Assignment indicates plainly that it is "given in connection with, and in consideration of, [KR's] purchase of certain loans made to Evergreen....and for other good and valuable consideration...."  That same loan is identified in Exhibit A as an instrument or agreement assigned by 1st Source to KR.  So I interpret the payments made by and on behalf of KR as the consideration for the "purchase of" the loan and its assignment, not as satisfaction of the loan, even if after receiving those payments 1st Source quite reasonably reflected the Evergreen loan as being paid insofar as the bank was concerned.

Understood this way, the General Assignment is not a nullity.  And it makes sense that the assignment also assigns 1st Source's interest in this lawsuit, so that KR could continue the effort to collect what BNRV owed to Evergreen.  What's more, the plain meaning of the General Assignment is not contradicted but affirmed by the evidence BNRV opposes, namely the testimony of Kelly Rose and 1st Source Vice President Richard Rozenboom, and associated emails and other writings, all indicating that the parties' obvious intent was for KR Enterprises to buy the Evergreen loan and obtain the security interest that would give them standing to pursue BNRV's debt to Evergreen. In sum, KR is the proper party to pursue BNRV for the unpaid 21 RVs.

## II.    Causes of Action

Now it is on to the meat of the matter, the three causes of action brought by KR. KR pleads three legal theories for recovery against BNRV: account stated (count 1); breach of contract (count 2); and conversion (count 3).  I will first address the claim for account stated and conversion before moving on to the most substantive of the claims—the one for breach of contract.

### A.    Action for Account Stated — Count 1

The first of KR's three causes of action is a claim for account stated.  I had an opportunity to review this claim back in July of 2018, and here is what I said back then:

> The claim of account stated in Count I requires an agreed final accounting between the parties as to an amount owed. *B.E.I., Inc. v. Newcomer Lumber & Supply Co., Inc.*, 745 N.E.2d 233, 236-37 (Ind.Ct.App. 2001).  BNRV's contentions about rebates and warranty-related amounts owed to it by Evergreen indicate that there exists no such agreed final adjusted balance.

Opinion and Order of 7/20/18, DE 74 at 8. No evidence was adduced at trial to change this basic point.

To support its assertion of the necessary "agreed final accounting," KR relies on the invoices provided with the 21 RVs and the demand letters sent by Evergreen in June and 1st Source in July, to which KR says BNRV did not object. But this overlooks BNRV's own step, taken before the demand letters were sent. BNRV's June 8, 2016 letter to Evergreen, sent in response to the news that Evergreen was going out of business, demanded Evergreen's payment of unpaid sales rebates and warranty claims. Whether or not the "accounts" pertinent to an "account stated" analysis are per vehicle or per dealership (or BNRV as whole for that matter), the evidence does not support relief for KR on the basis of account stated because I cannot reasonably find that there was ever an agreed final adjusted balance subject to enforcement by such a claim. Indeed, the extended nature of this litigation itself is proof to the contrary. Judgment will therefore be entered in favor of BNRV on Count 1.

###   B.   Conversion — Count 3

Next up is KR's conversion claim which appears to be limited to 20 of the 21 RVs — those remaining in BNRV's possession as of June 8, 2016 when BNRV revoked its acceptance of the RVs and demanded that Evergreen repurchase them. [DE 169 at 20.] KR cites I.C. §26-1-2-602(2)(a) which states that "after rejection, any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the

13

seller." KR also cites I.C. §26-1-2-401(4), which states that "rejection or other refusal by the buyer to receive or retain the good, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller." [*Id*.] The tort of conversion mimics the Indiana criminal conversion statute, and requires a showing that the defendant has "knowingly or intentionally exert[ed] unauthorized control over property of another." I.C. §35-43-4-3. *See also Clark-Silberman v. Silberman*, 78 N.E.3d 708, 715 (Ind.Ct.App. 2017).

A number of legal principles applicable to the Indiana tort of conversion make the claim a poor fit for the facts of this case. First, "'[w]here the initial possession is lawful, conversion occurs only after an unqualified demand for return.'" *Aaron MacGregor & Assoc., LLC v. Zhejiang Jinfei Kaida Wheels Co., Ltd.*, 328 F.Supp.3d 906, 929 (N.D.Ind. 2018), quoting *Coffel v. Perry*, 452 N.E.2d 1066, 1069 (Ind.Ct.App. 1983). BNRV's initial possession of the RVs was plainly lawful, as Evergreen delivered the RVs according to their usual course of dealing. More importantly, KR has not demonstrated that there was ever an unqualified demand for return of the RVs. Recall that KR demanded payment of the money that was due, not the return of the RVs.

Another limitation on the tort under Indiana law is that "the refusal to pay a debt will generally not support a conversion action." *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522, 532 (Ind.Ct.App. 2015); *see also Clark-Silberman*, 78 N.E.3d at 715. "[T]he failure to pay a debt does not constitute criminal conversion as a matter of law." *Tobin v. Ruman*, 819 N.E.2d 78, 89 (Ind.Ct.App. 2004). Relatedly, "Indiana courts also do not allow claims

14

for conversion in the context of contract disputes." *Clark-Silberman*, 78 N.E.3d at 715, citing *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind.Ct.App. 2008). Because the tort of conversion under Indiana law requires a demonstration of criminal *mens rea* (awareness of a high probability that control over the plaintiff's property was unauthorized), conversion is not intended to cover mere breach of contract or failure to pay a debt. *GHPE Holdings, LLC v. Huxley*, 69 N.E.3d 513, 522 (Ind.Ct.App. 2017); *JET*, 879 N.E.2d at 597.

In the context of the commercial relationship between Evergreen and BNRV, any or all of these nuances of Indiana law defeat KR's conversion claim. The RVs first came into BNRV's possession by means of an ordinary transaction with Evergreen, and not some unlawful taking. There is no evidence of an unqualified demand for the return of the RVs, either by Evergreen or any of its successors in interest. The dispute now before me is in the nature of a breach of contract and a failure to pay a contractual debt. Whether or not wrongful, BNRV's decision to retain the RVs (and ultimately to sell all but one of them), in the midst of a commercial dispute with Evergreen over liabilities for invoices, rebates and warranty repairs, does not meet the required criminal intent for conversion. As the Indiana Court of Appeals has said, "a party may not restyle a breach-of-contract claim as a tort claim simply to obtain additional damages." *JPMCC 2006-CIBC14 Eads Parkway, LLC v. DBL Axel, LLC*, 977 N.E.2d 354, 364 (Ind.Ct.App. 2012). Judgment will therefore be entered in favor of BNRV on Count 3.

15

### C.      Breach of Contract — Count 2

Finally, I turn to what this case has always been about: did BNRV breach the contracts it had with the various BNRV dealerships?  I will first consider the issue of liability, and because I am finding that BNRV did breach the contracts with Evergreen, I will then turn my attention to damages.

#### 1.  Liability

In Count 2 of the Amended Complaint, KR seeks to enforce the contracts created when Evergreen issued invoices to BNRV, which BNRV accepted by approving and accepting the delivery of the 21 RVs.  BNRV resists the breach of contract claim by attempting to enlarge the focus.  Instead of contracts to purchase individual RVs, BNRV speaks of a separate "account between each BNRV Defendant and Evergreen," with "purchases of RVs units, rebates, and warranties for each BNRV Defendant flow[ing] through its respective account with Evergreen."  [DE 171-2 at 4.]

This concept of "breach of account" is unpersuasive.  The notion that a "contract" can be construed out of the "contract documents governing each account between Evergreen and each BNRV Defendant" consisting of "a certificate of origin for each RV unit purchased by the BNRV Defendant account holder, an invoice for each RV unit, a standard Evergreen warranty on each RV unit, and a Rebate program on each RV unit" is entirely too amorphous.  [*Id*.] A course of dealing is not a contract.  BNRV cites no legal authority to support its approach, and I can find none either.

16

Obviously a breach of contract claim requires the existence of a contract, as well as the defendant's breach, and resulting damages. *Alexander v. Linkmeyer Development II, LLC*, 119 N.E.3d 603, 612-13 (Ind.Ct.App. 2019). The basic elements of a contract are "offer, acceptance, consideration, and manifestation of mutual assent." *Martins v. Hill*, 121 N.E.3d 1066, 1068 (Ind.Ct.App. 2019). This formula does not describe the melange of documents BNRV describes, particularly across months or even years worth of sales and purchases of multiple vehicles. What BNRV describes is a working relationship, not a unitary contract.

The complaint clearly identifies the contracts in question as BNRV's agreements to purchase the 21 RVs. [DE 111 at ¶¶34, 37.] The Indiana UCC Chapter governing Sales provides that, "unless the context otherwise requires, 'contract' and 'agreement' are limited to those relating to the present or future sale of goods." I.C. §26-1-2-106(1). BNRV attempts to construe the "contract" at issue as the entire sweep of the parties' relationship as buyer and seller. Under the UCC, a course of dealing and a course of performance both involve the sequence of previous conduct between the parties. I.C. §26-1-1-205(1) and (2). Although an established course of dealing or course of performance may "give particular meaning to and supplement or qualify terms of an agreement," it does not constitute the agreement. I.C. §26-1-1-205(4). BNRV does not succeed in arguing its way to an alteration of the breach of contract claim to encompass the parties' entire course of performance rather than its agreement to buy the 21 RVs.

17

From that larger "account" vantage point, BNRV argues that Evergreen committed the first material breach of contract, by not paying warranties and rebates on 45 other RVs previously sold by Evergreen to BNRV.  [*Id.*]  On that basis, BNRV takes the position that KR, standing in Evergreen's shoes, cannot maintain an action against or recover damages against BNRV for breach of the contract, citing *Ream v. Yankee Park Homeowner's Ass'n, Inc.*, 915 N.E.2d 536, 547 (Ind.Ct.App. 2009) ("A party first guilty of a material breach of contract may not maintain an action against or recover damages from the other party to the contract.").  [*Id.*]  This position is defeated by my rejection of the notion of a larger over-arching "account" with each dealership as the appropriate unit of measure for breach of contract analysis.

In any event, as the trier of fact, I am entirely unpersuaded that Evergreen's arrearage on warranties and rebates constituted a *material* breach of the "account" between BNRV and Evergreen.  A material breach is said to go to "the heart" of the contract.  *State v. International Business Machines Corp.*, 51 N.E.3d 150, 158-59 (Ind. 2016).  If the frame of reference is the overall supplier-purchaser relationship between the two as BNRV advocates, the "account" was not materially breached, given BNRV's continued purchases of additional RVs from Evergreen despite what BNRV believed it was owed.

BNRV also contends that Evergreen committed a "second material breach" by delivering each of the 21 RVs "in a defective condition." [*Id.*] This is a curious argument. The defect alleged is that *after delivery* of the RVs, Evergreen went out of business and

18

thereby voided the standard manufacturer's warranty.  The idea that this post-delivery eventuality constituted a defect upon delivery is creative, but not persuasive, either factually or logically.

With those defensive positions out of the way, I must determine what *was* the contract governing the sale of the 21 RVs to BNRV?  KR takes the position that Evergreen's invoices were offers to sell each RV, which BNRV accepted by sending approval emails to its floor lender M&T Bank.  Joseph Katona, III, who was Evergreen's Chief Financial Officer, described the course of dealing in his trial testimony.  Evergreen would receive an order from BNRV, schedule and build the unit, then contact the dealer for a purchase order number and the floor plan lender for funding approval and authority to ship the unit.  [DE 162 at 48, $\ell$.21 - 49, $\ell$.3.]  Once the dealer received the RV, Evergreen would receive payment from M&T Bank.  [*Id*. at 50, $\ell\ell$.1-6.] No payment was received, and that constitutes a breach by BNRV.

Having rejected BNRV's concept of "breach of account" per dealership, my analysis of the breach of contract claim focuses on the sale of each particular RV that is the subject of KR's complaint in this case.  And that entails the computation of amounts owing from each particular defendant dealer on the RVs they obtained from Evergreen.  But before getting in the particulars, this seems like an appropriate juncture to address the issue of joint versus individual liability of the dealer defendants.  KR has taken the position that liability should be joint and several over all the defendants, whereas

19

BNRV contends that any judgment in KR's favor is appropriate only against each dealership defendant separately in an amount specific to its purchases from Evergreen.

BNRV has the better of this argument.  The defendants are four corporations and three limited liability companies.  The Supreme Court of Indiana has expressed the "general rule of corporate law," namely that "a corporation will not be held liable for the acts of other corporations" and "distinct corporations...are presumed separate." *Greater Hammond Community Services, Inc. v. Mutka*, 735 N.E.2d 780, 784 (Ind. 2000).  A party attempting to shift liability from one corporation to another faces a heavy burden.

To overcome the presumption that distinct corporations are separate, "a plaintiff must show that one corporation dominated another to the extent that" one of three circumstances existed.  *Id*.  The first is that the "subordinate was the mere instrumentality of the dominant corporation."  *Id*.  The second, not at all applicable to the facts here, is "that the dominant corporation employed the subordinate to perpetrate a fraud."  *Id*.  The third possibility, also irrelevant for present purposes, has to do with the under-capitalization of the subordinate corporate entity.  *Id*.  Fatal to KR's joint liability theory is the Supreme Court's final requirement for ignoring the corporate form: the plaintiff must demonstrate that the business relationship of the corporations "was the proximate cause of the injury sustained."  *Id*.  Clearly, it is not the case that however the BNRV entities are related or function jointly, that relationship was the cause of BNRV's failure to pay for the 21 RV's.

20

KR, whose post-trial filings cite no legal authority at all on the issue, has never articulated a cogent legal argument for the imposition of joint liability across these distinct, albeit related, entities.  [DE 169 at 26-27; DE 170 at 24-26.]  KR has also failed to present evidence of the sort necessary to overcome the presumption that the defendants are separate business entities and to disregard their corporate forms.  This is particularly so considering the novelty of KR's attempt to spread the liability of 6 separate entities across all of them, rather than, as usually the case with corporate veil-piercing, to ascribe the liability of one "underling" entity to a single other controlling entity or person.  The common ownership and decisionmaking by Don Littlefield, and the co-borrowing arrangement with M&T Bank as floor lender, are not sufficient factually or legally, to support treating all six defendants as if one mega-entity.  Evergreen set up separate accounts with each dealership, based on their separate dealership applications.  And Littlefield is not named as a defendant and so cannot be made to bear the liability of all the corporate entities, even if the facts or law were shown to support such a conclusion.

### 2.   Damages

The final and most difficult issue is assessing damages for the breaches of contract. "Generally, the computation of damages is a matter within the sound discretion of the trial court." *Irmscher Suppliers Inc. v. Schuler*, 909 N.E.2d 1040, 1049 (Ind.Ct.App. 2009).  As to the appropriate relief for BNRV's breaches of contract, the scope now widens in much the way BNRV has advocated.  "[T]he UCC makes clear that

21

the provisions of a contract ought to be harmonized with the parties' course of performance, course of dealing, and the usage of trade." *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 876 F.Supp.2d 1042, 1054 (Ind.Ct.App. 2012), quoting Sections 1-205(4) and 2-202 of the UCC. " One of the broad remedial goals of the Uniform Commercial Code is that the aggrieved party be put in as good a position as if the other party had fully performed, but not in a better position." *Gen. Motors Corp. v. Sheets*, 818 N.E.2d 59, 54 (Ind.Ct.App. 2004).   With these principles in mind, I must consider whether and to what extent various setoffs urged by BNRV, such as for sales rebates, warranty claims, and diminished value, may reduce the damages to be awarded KR for each dealership's breaches of contract.

As a general rule, an assignee takes an assignment of a contract subject to the defenses and claims of the account debtor against the assignor.  *See Voris v. Ferrell*, 103 N.E. 122, 127 (Ind.Ct.App. 1913) ("The assignee of a past-due note takes the same subject to all the equities and defenses available against it in the hands of his assignor.").  *See also Restatement (Second) of Contracts* §336(1), (2), and (4).

Consistent with that principle, BNRV contends that I.C. §26-1-9.1-404, a section from Indiana's Uniform Commercial Code, applies here to subject KR to each BNRV defendant's setoffs related to both the 21 RV units KR brings suit about, as well as setoffs related to other Evergreen RVs.  For its part, KR argues, as a categorical matter, that it is not subject to *any* setoffs because that provision of the UCC does not apply.

Section 9.1-404 reads:

   (a) Unless an account debtor has made an enforceable agreement not to assert defenses or claims,…the rights of an assignee are subject to:
   (1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and
   (2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

BNRV treats "account debtor" to mean each BNRV defendant, "assignor" to mean Evergreen, and "assignee" to be KR.  [DE 171-3 at 4.]  BNRV takes the position that subsection (a)(1) means all setoffs BNRV had against Evergreen concerning the 21 RVs now apply as against KR, and that subsection (a)(2) means that KR is subject even to setoffs preexisting the sale of the 21 RVs.  [*Id*.]  KR contends that Section 9.1-404 is not applicable here, because it "applies only when someone takes either a security interest in or complete ownership of an existing account receivable." [DE 169 at 25.]  By KR's analysis, the original security interest of 1st Source, later assigned to KR, arose under the 2009 Loan and Security Agreement, "which was executed before any particular account receivable came into existence between BNRV and Evergreen."  [DE 169 at 25.]

Strangely, both sides cite the same case in support of their interpretation of Section 9.1-404, *InfinaQuest, LLC v. DirectBuy, Inc.*, 18 F.Supp.3d 959 (N.D.Ind. 2014).  KR's legal contention about the requirement of an existing account receivable is taken directly from *InfinaQuest*, 18 F.Supp.3d at 964.  BNRV says, notwithstanding that principle, the security interest in Evergreen's account receivables applies to accounts

23

"whether now owned or existing or hereafter acquired or arising," which makes all of its setoffs applicable against KR as the assignee.  [Def. Exh. 3 - 11.]  BNRV cites *InfinaQuest* for that court's reliance on similar language to conclude that the assignor took its security interest subject to a preexisting right of setoff.  18 F.Supp. 3d at 965.

KR took its assignment of the security interest in Evergreen's account receivables as of May 1, 2018.  Evergreen's account receivable with BNRV was long in existence at that time.  Furthermore, all of BNRV's claimed setoffs accrued prior to the assignment to KR, and so necessarily before BNRV received notification of that assignment.  I am persuaded that §9.1-404(a)(1) and (2) both apply, as BNRV contends, to render KR subject to all applicable defenses or claims of BNRV on the accounts receivable.

With that matter decided, the issue becomes what offsets are applicable here and how much are those offsets?  Those are the questions I'll turn to next.

### a.    Setoff for Rebates

The first issue relating to setoff is the amount that damages should be reduced for unpaid rebates. KR's best argument against BNRV's entitlement to rebates on the 21 RVs is that the RVs have never been paid for.  The rebate program in effect in April and May of 2016 provided for the quarterly payment of rebates "on products that were shipped and funded in that quarter."  [Def. Ex. 42,  p.3.]  Evergreen's CFO Joseph Katona, III testified that rebates were paid after the customer-dealer had paid for the vehicle, and that if Evergreen was not paid for a unit then no rebate was due. [DE 162 at 116, ℓℓ. 5-11.]  Similarly, BNRV's own General Counsel repeatedly described the rebates

as payable on units "shipped and funded" during the quarter.  [D.E. 162 at 201, ℓℓ.10-17.]  Shields also testified that the 3% rebate was payable "[o]nce [BNRV] paid for and stocked the unit."  [DE 163 at 12, ℓ.14.]  Shields flatly acknowledged that BNRV had not "qualified" for a "stocking rebate" on any of the 21 RVs in this case, because BNRV "had not paid for the units."  [*Id.* at 28, ℓℓ.7-21.]  BNRV argues that if they have to pay now, they should get the benefit of the rebates.  But the terms of the rebate program clearly conditioned the rebates on timely "funding" of the RV purchase within the quarter it was shipped, so belated payment of the invoice years later only when reduced to judgment after litigation does not entitle BNRV to rebates on the 21 RVs.

But the judgment will reflect set-offs for other outstanding rebates that were previously owed by Evergreen, so long as evidence adduced at trial adequately identified those amounts and supports such a calculation.  Exhibit 43 reflects rebates due (but never paid) to various BNRV dealerships for first quarter 2016.  The document appears to have been generated by Evergreen, and was adopted by Evergreen's Vice President of Sales and Marketing when he identified those rebates as payable in his April 13, 2016 email to Don Littlefield.  In addition, Exhibit 43 identifies the particular dealership defendant associated with each vehicle and its rebates.

By contrast, Exhibit 101 was offered at trial by BNRV as its General Counsel's effort to capture data on all vehicles subject to the rebate program that began in Spring 2016.  The trial transcript reflects some confusion about overlap between Exhibits 43 and 101.  With its post-trial briefing, BNRV offered a copy of Exhibit 101 on which

handwritten annotations and highlights have been added. The highlighting was added to distinguish duplications of vehicles also reflected in Exhibit 43. The handwritten annotations denote which vehicles are associated with which defendant dealership, and reflect totals of the rebates BNRV claims each defendant is due.

The problem with this should be obvious: the "new" Exhibit 101, proffered only after the trial, was not subject to challenge through cross-examination. The dealership designations in the document represent a substantive evidentiary element that must be rejected. In other words, BNRV does not identify *trial evidence* that supports the association of particular vehicles on Exhibit 101 with particular dealerships, because there was no such evidence. I must therefore reject BNRV's efforts to supplement the trial record with the post-trial addition of dealership designations on Exhibit 101. And without that information, Exhibit 101 does not provide evidentiary support for assessing the rebates on each vehicle to a particular defendant dealership.

BNRV General Counsel Thomas Shields testified that Evergreen had paid BNRV all rebates due through 2015. [DE 163 at 15, ℓℓ. 15-17]. So the rebates that remain due are those from the beginning of 2016 through Evergreen's closure in June 2016. Based on the rebate data reflected in Exhibit 43, which I am crediting, the judgment against each defendant will therefore be subject to the following rebate offsets:

Zerteck, Inc.:  $6,252.45

Tilden Recreational Vehicles, Inc.: $9,116.96

Ridgeland Recreational Vehicles, Inc. (d/b/a Boat-N-RV Megastore): $7,192.05

26

Crossville BNRV Sales, LLC:  $29,794.10[1]

Florida BNRV Sales, LLC:  $4,371.75

Ridgeland Recreational Vehicles, Inc. (d/b/a Boat-N-RV World (NC)): $4,682.10.

### b.    Setoff for Unpaid Warranty Work

The next issue concerns setoffs for unpaid warranty work. As with rebates, I will reduce the judgment against each defendant dealership by the demonstrable amounts owed by Evergreen on warranty claims.  Evidence at trial indicated that Evergreen last paid warranty claims to BNRV on January 26, 2016, and that BNRV stopped tracking warranty claims after November 30, 2017.  The window of payable warranty claims can be further narrowed because BNRV terminated all existing dealer agreements for Evergreen products as of its June 8, 2016 letter, and Evergreen's Limited Warranty provides coverage only where the consumer has given timely notice of a warrantable issue to "an authorized Evergreen RV dealership."  [Def. Exh. 46 at 1.]  This condition supports KR's argument that BNRV's termination of the authorized dealer relationship also terminated warranty coverage for repairs BNRV did on claims made thereafter.  On this rationale, the warranty repairs catalogued in Exhibit 54 occurring "since closure of Evergreen" are not recoverable, as by definition each of those occurred after BNRV's June 8 termination letter.  In addition, Exhibit 54 does not show the specific dealership

---

[1]The evidence reflects that Don Littlefield has assigned his personal claim for rebates to defendant Crossville, the Tennessee dealership, which is reflected in this total.  [Def. Exh. 44.]

associated with each repair, and so cannot support the separate liability per defendant that BNRV has requested.

My computation of warranty setoffs will instead be based on Exhibits 49 through 53, which are reports for each dealership showing warranty claims outstanding as of June 30, 2016. These reports generated by BNRV reflect a Claim Number assigned by Evergreen and a Claim Date. Any claims dated after June 8, 2016 will be eliminated from the setoff calculation as having been made after the dealership was no longer an authorized BNRV dealer. For the Tilden dealership in Pennsylvania, KR disputes the legitimacy of setoffs for 24 warranty claims, each in the amount of $975.12 and with a claim date of October 16, 2013, which show as "Pending" without a Claim Number. Based on the lack of satisfactory explanation of these anomalies in the trial testimony on this subject, I conclude that these 24 claims, totaling $23,402.88, have not been adequately proved as recoverable warranty claims.

Based on the figures shown in Exhibits 49 to 53, subtracting any warranty claims with a Claim Date after June 8, 2016, and subtracting from Exhibit 51 all "Pending" claims with no Claim Number dated October 16, 2013, I will reduce the judgments against each defendant dealership for warranty claims owed as follows:

Zerteck, Inc.: $2,723.77

Tilden Recreational Vehicles, Inc.: $43,961.83

Ridgeland Recreational Vehicles, Inc. (d/b/a Boat-N-RV Megastore): $20,861.73

Crossville BNRV Sales, LLC: $30,541.13

Ridgeland Recreational Vehicles, Inc. (d/b/a Boat-N-RV World (NC)): $560.86

### c.    Diminution in Value

The next issue relating to damages calculation is whether diminution in value of the RVs is a recoverable offset.  BNRV has offered no legal theory for its claimed entitlement to setoff for diminished value of the RVs due to Evergreen's going out of business and the loss of a manufacturer's warranty. It seems to me that one of the general hazards of business is that a supplier may go belly up. But more to the point, even if this species of setoff had legal support, BNRV's proof was inadequate anyway.

As KR points out, BNRV did not present expert testimony on the subject, but merely relied on the testimony of its General Counsel, Thomas Shields, who offered nothing more than vague testimony about discounted prices on Evergreen's RVs post-closure.  [DE 162 at 212, ℓℓ. 7-13.] BNRV also cites the testimony of 1st Source's Richard Rozenboom that during Evergreen's liquidation of assets, it sold "some" of its RV inventory at discounts of 20 to 30% off the manufacturer's retail price. [Exh. Y-1 , ℓℓ.6-17.] These cobbled-together bits of indefinite anecdotal testimony are an insufficient basis to reasonably determine an appropriate setoff for diminished value, even if there were a legal basis for awarding it.

And (to repeat myself) BNRV has not articulated, or supported with authority, a legal argument for an entitlement to setoff for diminished value.  And finally, and in all events, I'm dubious of the claim.  Recall that BNRV sold 20 of the 21 RVs for the total amount of roughly $1.05 million; recall further that they had paid approximately

$808,000 for all 21 units.  All of which is to say that I look askance at any claim that the RVs diminished in price, and if they did, the diminution would have been slight.

### d.      Prejudgment Interest

KR wants pre-judgment interest computed from June 8, 2016, the date BNRV revoked its acceptance of the 21 RVs, citing *Thomson Inc. v. Ins. Co. of  N. Am.*, 11 N.E.3d 982, 1032  (Ind.Ct.App. 2014).  In a shocking development, BNRV disagrees.  [DE 171-3 at 10ff.]  "The availability and amount of prejudgment interest are substantive for *Erie Railroad* purposes, so we look...to state law."  *Abellan v. Lavelo Property Management, LLC*, 948 F.3d 820, 833 (7th Cir. 2019).  As the Indiana Court of Appeals explains in *Thomson*, "[a]n  award of prejudgment interest is proper only where a simple mathematical computation is required," and "[d]amages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest."  *Id*. at 1032.  For the same basic principle about whether or not damages are readily ascertainable, BNRV cites *Henderson v. Leibowitz*, 490 N.E.2d 396, 400 (Ind.Ct.App. 1986) (prejudgment interest is "not proper when the court must determine the value of liability").

Of course, KR believes BNRV's disputes about damages are illegitimate and that the amount KR is due is readily ascertainable.  The complexity of the rulings and computations I have articulated above demonstrate otherwise.  Because the various types of damages are subject to a good faith dispute in this case, I readily conclude that an award of prejudgment interest is not appropriate under the governing principles of Indiana law.

## Final Computation of Damages

Based on these determinations as to applicable setoffs, my computation of the

damages against each defendant is set out below:

Zerteck, Inc., d/b/a Boat-N-RV Warehouse:
| | |
|---|---|
| $ 117,815.00 | Total Invoice for 3 RVs |
| -  6,252.45 | Rebates Owed |
| -  2,723.77 | <u>Warranty Claims Owed</u> |
| $108,838.78 | Total Damages |

Tilden Recreational Vehicles, Inc., d/b/a Boat-N-RV Superstore:
| | |
|---|---|
| $ 82,785.00 | Total Invoice for 3 RVs |
| -  9,116.96 | Rebates Owed |
| - 43,961.83 | <u>Warranty Claims Owed</u> |
| $ 29,706.21 | Total Damages |

Ridgeland Recreational Vehicles, Inc., d/b/a Boat-N-RV Megastore:
| | |
|---|---|
| $ 89,420.00 | Total Invoice for 3 RVs |
| -  7,192.05 | Rebates Owed |
| - 20,861.73 | <u>Warranty Claims Owed</u> |
| $ 61,366.22 | Total Damages |

Crossville BNRV Sales, LLC, d/b/a Boat-N-RV Supercenter:
| | |
|---|---|
| $ 224,279.00 | Total Invoice for 5 RVs |
| - 29,794.10 | Rebates Owed |
| -  30,541.13 | <u>Warranty Claims Owed</u> |
| $163,943.77 | Total Damages |

Florida BNRV Sales, LLC, d/b/a Factor Direct Marine & RV:
| | |
|---|---|
| $219,230.00 | Total Invoice for 5 RVs |
| -  4,371.75 | <u>Rebates Owed     </u> |
| $214,858.25 | Total Damages |

Ridgeland Recreational Vehicles, Inc., d/b/a Boat-N-RV World
  (North Carolina):
| | |
|---|---|
| $ 75,134.00 | Total Invoice for 2 RVs |
| - 4,682.10 | Rebates Owed |
| -   560.86 | <u>Warranty Claims Owed</u> |
| $ 69,891.04 | Total Damages. |

31

The same corporate entity, Ridgeland Recreational Vehicles, Inc., operates two dealership defendants, the Boat-N-RV Megastore in South Carolina and Boat-N-RV World in North Carolina.  KR's pleading names the dealerships as separate defendants, distinguishing the same corporate entity with distinct "d/b/a" designations.  I will use the same distinction in entering the judgment.

## Conclusion

This is litigation that probably never should have happened.  BNRV never paid for the 21 RVs it received from Evergreen despite having sold 20 of them and pocketing the money.  Somehow BNRV convinced itself that they didn't have to pay, as if the RVs were some kind of freebie. Yet that was BNRVs astonishing position throughout this litigation. And just the same, it seems clear that Evergreen owed BNRV some money back.  That commonsense result, which as demonstrated above, is well supported by Indiana law, should readily have been achieved by the parties without three years of costly litigation, extended discovery, four motions for summary judgment, and a bench trial.

In any event, I have found the BNRV defendants liable for breach of contract for their failure to pay Evergreen for the 21 RVs identified in the second amended complaint.  By means of the assignment of 1st Source Bank's interest in Evergreen's accounts receivable, KR Enterprises has standing to bring this action against BNRV to recover on those accounts against the BNRV defendants.  As the trier of fact, I, unlike a jury, am required to explain the grounds of my decision.  *See* Fed.R.Civ.P. 52(a).  "'This

means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connects the evidence to the conclusion.'" *Alpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008), quoting *Jutzi-Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001).  I have made every effort to calculate damages reasonably and as supported by the evidentiary record.

KR's second amended complaint sought judgment in the amount of $808,663.00 in compensatory damages for the total unpaid invoice price of the 21 RVs.  The judgment I have calculated awards as against each defendant dealership the invoice price of the RVs it purchased, minus warranty claims and rebates owed to the dealership by Evergreen.  The $808,663.00 total invoice price is reduced overall by $61,409.41 in total rebates and $98,649.32 in total warranty claims, for an aggregate judgment of $648,604.27 in KR's favor.

**ACCORDINGLY:**

Based on the court's findings of fact and conclusions of law after a bench trial, the Clerk shall enter judgment in favor of plaintiff KR Enterprises, Inc. and against each of the defendants in the following amounts:

Zerteck, Inc., d/b/a Boat-N-RV Warehouse:  $108,838.78

Tilden Recreational Vehicles, Inc., d/b/a Boat-N-RV Superstore: $29,706.21

Ridgeland Recreational Vehicles, Inc., d/b/a Boat-N-RV Megastore: $61,366.22

Crossville BNRV Sales, LLC, d/b/a Boat-N-RV Supercenter: $163,943.77

Florida BNRV Sales, LLC, d/b/a Factor Direct Marine & RV: $214,858.25

Ridgeland Recreational Vehicles, Inc., d/b/a Boat-N-RV World (North

Carolina): $69,891.04.

Post-judgment interest will accrue at the applicable rate.  Upon the entry of judgment,

this matter shall be CLOSED.

ENTERED: May 20, 2020.

_/s/ Philip P. Simon_____
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**